**UNITED STATES of America, Plaintiff,**

v.

**Michael SANDBORN, Defendant.**

**No. G89-72 CR.**

United States District Court,
W.D. Michigan, S.D.

March 28, 1990.

John A. Smietanka, Grand Rapids, Mich., Mark V. Courtade, Jenison, Mich., for U.S.

Larry C. Willey, Grand Rapids, Mich., James Edward Bliss, Lansing, Mich., for defendant.

### OPINION

ENSLEN, District Judge.

This case is before the Court on defendant Michael Sandborn's December 6, 1989 Motion to Reduce Sentence under Rule 35 of the Federal Rules of Criminal Procedure. The May 9, 1989 indictment in this case charged defendant Sanborn and another with conspiring to distribute and possession with intent to distribute heroin and cocaine in violation of 21 U.S.C. §§ 841, 846. Two other defendants were charged in Count II with conspiring to import and

attempt to import into the Western District of Michigan from Bangkok, Thailand a quantity of heroin.[1] Defendant Sandborn entered into a plea agreement with the government on July 7, 1989. Under the plea agreement, he pled guilty to Count I, and the government dropped Count III, a racketeering offense.

This Court imposed the harshest possible sentence under the plea agreement on August 23, 1989. Defendant Sandborn was sentenced to seven years imprisonment to be served pursuant to 18 U.S.C. § 4205(b)(2).[2] At sentencing, I seriously considered not accepting the plea agreement, because of the seven year maximum on sentencing.

Defendant has apparently been through a "comprehensive and rigorous" chemical dependency program at the Rochester Federal Medical Facility. Defendant's Brief in Support, at 1 (Dec. 6, 1989). From there, defendant is scheduled to transfer to a permanent designation, possibly Yangton, South Dakota.

According to defense counsel, defendant has not appealed this case, and has proposed to the Attorney Grievance Administrator—by way of a proposal for consent discipline—that his license to practice law be revoked. This is the harshest discipline available and defendant's proposal will "no doubt ... be accepted." *Id.* at 2.

## DISCUSSION

Defendant has filed a timely motion to reduce his sentence pursuant to Fed.R. Crim.P. 35(b).[3] Rule 35(b) reads as follows:

(b) **Reduction of Sentence.** A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation is revoked, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of an order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction or probation revocation. The court shall determine the motion within a reasonable time. Changing a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under this subdivision.

■ A motion for reduction of sentence, filed pursuant to Fed.R.Crim.P. 35(b), is addressed to the sound discretion of the trial court. *United States v. Bedrosian,* 631 F.2d 582, 583 (8th Cir.1980); *United States v. Warren,* 610 F.2d 680, 684 (9th Cir.1980). The trial judge's discretion is limited, however, to a reconsideration of the original sentence; he or she may not usurp the authority of the Parole Board by waiting to consider subsequent developments such as petitioner's deportment in prison. *United States v. Taylor,* 768 F.2d 114, 118 (6th Cir.1985).

■ A motion under Rule 35(b) is "essentially a plea for leniency and presupposes a valid conviction." *United States v. Colvin,* 644 F.2d 703, 705 (8th Cir.1981). The sentencing court usually will not reduce the sentence imposed where nothing is shown to justify a reduced sentence that was not already considered by the court when the initial sentence was fixed. Wright, *Federal Practice & Procedure, Criminal* 2d § 586, at 401–04.

Defendant argues to this Court that a "Rule 35(b) motion allows the trial court a 'second' look and the attorneys an opportunity for a better presentation of the rele-

---

1. Paul Vogel was charged with defendant Sandborn in Count I. David Bowman and Victor Grassington were charged in Count II. All defendants pled guilty.

2. Under 18 U.S.C. § 4205(b)(2), defendant may be released on parole at such time as the Parole Commission deems appropriate. This specification is not, of course, binding on the Commission.

3. Rule 35 is newly amended; however, the old rule still applies here because the offense occurred before the new sentencing guidelines took effect. Section 24 of the Sentencing Reform Act of 1987, Pub.L.No. 100–182, indicates that Rule 35(b) as amended by the Reform Act shall apply where the offense takes place prior to November 1, 1987, the effective date of the Sentencing Reform Act.

vant factors, some of which may not have been presented at all or [some] presented inadequately." *Id.* Defendant's attorney tells the Court that:

> The sentencing in this case still is a vivid, albeit unpleasant, image to defense counsel. It lasted approximately nine (9) hours over a two day period. For a time, it seemed that it had a life of its own and that it would never end. In this process, we submit that the focus was lost on the many positive attributes of Mr. Sandborn. Hours were spent listening to the tape of March 28, 1984 [which involved a murder plot], in an attempt to identify Mr. Sandborn's voice from the voices of the more active Mr. Vogel, Mr. Burnett, and Mr. Cantu. Significant time was also spent on the issue of whether Mr. Sandborn stole some of the money that had been provided for the Burnetts in Thailand.

*Id.* at 3. Defense counsel concludes that while these topics were relevant, they "seemed to pervade and overwhelm the entire proceeding." *Id.*

Defendant thus asks this Court to reconsider along with the aforementioned conduct the "positive report from Dr. Decker", a report I requested at the time of the guilty plea. *Id.* I am also asked to consider again defendant's positive contributions as father, friend, soldier, and lawyer. Defendant also points out that he did not profit monetarily from his connection with drugs. Defendant contends that his sentence was excessive when compared to those imposed on the other three defendants, Vogel, Bowman, and Grassington. Finally defendant suggests that deterrence, punishment, and rehabilitation can all be accomplished through a lighter sentence, and urges the Court to consider the following:

1. Defendant's service in Vietnam;
2. Dr. Decker's report;
3. Defendant's positive contributions as friend, lawyer, and parent;
4. Defendant's response to his arrest, including the guilty plea and his cooperation which assisted in the co-defendants' guilty pleas;
5. Defendant's drug addiction, and his lack of profit from the drug activities;
6. The punishment inflicted thus far;
7. The needs of others, including his young daughters; and
8. The other sentences imposed in this case.

*Id.* at 4–5.

The government makes some important points here.[4] It contends that defendant was sentenced to seven years imprisonment "in an act of leniency." Government's Brief, at 1 (Jan. 22, 1990). According to the government, the Court spoke at length about seven of the eight factors above during the sentencing, and took them into account with a number of other factors, including his involvement in a plot to murder a competing drug dealer; the attempt to bribe foreign officials in Thailand; the embezzlement of some $22,000 from a client; the standard of conduct given his position as an attorney and member of the bar; and his false statements to the Grievance Administrator of the Michigan bar. The government also correctly points out that I considered rejecting the plea agreement in this case because I queried whether defendant Sandborn's conduct warranted harsher treatment.

Thus, from the government's vantage point, this Court has already considered all but one of the factors listed by defendant in support of the Rule 35 motion.[5] And the

---

**4.** The Court does not agree with defendant's suggestion in his reply brief that "a prosecutor is probably out of line to opine that any sentence is 'unduly harsh', [because] [s]uch a position would be inconsistent with the responsibilities and function of that office." Reply Brief, at 1 (Feb. 5, 1990).

**5.** Defendant urges that the government has confused defendant's argument here, and states that

the seven factors were known by the Court during sentencing, but because of the lengthy nature of the negative considerations, the seven factors were not *stressed* appropriately. Defendant concludes that this was "not the Court's fault", but probably defendant's failure to adequately articulate or stress them. Defendant's Reply Brief, at 2 (Feb. 5, 1990).

government contends that the sentences of the co-defendants—the eighth factor—are not out of line when compared with defendant Sandborn's seven year sentence.[6]

■ The Court has reviewed the Rule 35 briefs and the presentence documents, including the report from Dr. Decker. As I analyze the sentence imposed in August 1989, I first look for a change in circumstances, and find none.[7] That is not the end of the inquiry, however. Counsel for defendant has argued quite eloquently that at the time of sentencing, the Court—for a number of reasons—did not balance its consideration of positive and negative sentencing factors. Yet as I look back at the many hours I deliberated over Michael Sandborn's sentence, it is clear that there were many important questions about the negative factors which needed resolution. I was affected by much of defendant's conduct, including his involvement in a murder plot, the embezzlement of funds from the family of clients who were imprisoned in a Thai jail, and the misleading statements made to the Grievance Administrator of the Michigan bar. If this Court spent significant time on these factors, it is because they reflect a serious weakness of character. These factors, balanced with *all* the others, good and bad, led me to rethink and shift my initial reaction which was to reject the plea bargain because of its seven year cap. I do not think I have said that strongly enough.

At his plea, defendant looked me in the eye and swore that he had never had anything whatsoever to do with a murder plot. He *was* a drug addict, he said, but a murder plot? Never. As the facts at sentencing became unraveled, my first inclination was to go no further, and to reject the plea bargain. Thereafter, defense counsel convinced me not to do so. That shift in my position occurred because of the whole picture—the many positive and negative shades that make up the full portrait of Michael Sandborn. Thus I am convinced that I fairly and accurately weighed all factors when I sentenced defendant to seven years incarceration.

I must also say that I pondered this sentence in light of what I believe to be the duties of a lawyer, who, like a police officer is in a position of trust and charged with upholding the law. To whom much is given, much is likewise expected. I wonder whether this is even more true in the case of Michael Sandborn. It seems to me that a criminal defense lawyer is in the unique position of being able to set an example for a client by his own ethical standards. While a lawyer may not consciously realize it, he or she may well serve as a kind of role model for the criminally accused client. If the lawyer exhibits to the client a low ethical and moral profile, the client may believe that it represents a standard among the legal and judicial community for illegal and unethical conduct. We all seek approval for our conduct, and we are all relieved when a person occupying a "higher station" seems to endorse our own behavior. In short, a lawyer who represents persons accused of crime is in a unique position to cause the client serious harm. Indeed, it could be argued that a former client may engage in future misconduct, in part, because of the behavior of his or her lawyer. In the case of Mr. Sandborn the point is emphasized by his joining his clients in criminal conduct. Not only did he appear to condone the client's illegal behavior, he actually participated in it with his clients.

By contrast the lawyer may serve as a positive role model for his or her clients. Exemplary respect for law and demonstrated personal and moral behavior may well influence the client in a positive fashion. I have, in my 32 years as a lawyer and judge, observed instances where I believed that the lawyer in fact had contributed to

---

**6.** Defendant objects to the government's characterization of his sentence as being the "bench mark" for the other sentences, because even if this is true, he argues, he should not have been that bench mark. "After all", defendant points out, "[codefendant] Vogel was more involved in drugs . . . and more involved in the murder plot

[than] the government emphasizes." Reply Brief, at 2.

**7.** This Court has sentenced the four individuals in this case to levels which reflect their various levels of culpability.

the future benefit of his or her client. Such a lawyer prepared the pleadings for this motion.[8] Thus reform or ruin may in fact stem from the defense attorney's decision to assist or engage in unlawful conduct.

My final thoughts are that Michael Sandborn worked hard as a young man to achieve his position as a college-educated man, and eventually as an attorney. I have been impressed by the circumstances in his life which demonstrate loyalty to country, motivation and diligence. It seems to me that no one—especially a young man more pampered—would be more capable of assessing the value of the position he had attained. A life in the law is truly a good one—one of the best, perhaps. After all I have done to try to understand this defendant, I am still perplexed as to why he was so careless with the position he so clearly *earned*. I charge that no one knew better than Michael Sandborn the value of the life he had made for himself; I wish he had known more.

Therefore, based on all the foregoing, I will not grant defendant's request for reduction of sentence under Rule 35(b). It is my sincere hope that defendant's prison years will aid him in his battle against chemical dependency and will be a turning point for him and his future.[9]

---

**8.** This Court is always appreciative of intelligent, well-prepared, analytical counsel. I believe criminal defendants receive a special benefit from lawyers, like Mr. Willey, who possess these attributes, and in addition, maintain the highest standards of ethical conduct.

**9.** William A. Decker, M.D. says of defendant:

Michael had and *still has* the potential for being a productive, contributing member of society, operating within the bounds of acceptable behavior.

Presentence Report of Decker, at 6 (Aug. 7, 1989).